**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **SANDRA KAY GAUGHT MANN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Civil Action No.: 5:12-CV-02210-RDP** |
| | } | |
| **MICHAEL J. ASTRUE,** | } | |
| **Commissioner of** | } | |
| **Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

**MEMORANDUM OF DECISION**

Plaintiff Sandra Kay Gaught Mann brings this action pursuant to Title II of Section 205(g) of the Social Security Act ("the Act"), seeking review of the decision by the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability and disability insurance benefits ("DIB"). Based upon the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

**I.    Proceedings Below**

On November 2, 2009, Plaintiff filed her application for disability and DIB under Title II of the Act in which she alleged that disability began on April 25, 2009. (R. 122-23, 125). Plaintiff's application was denied on December 21, 2009. (R. 96, 100). Plaintiff then requested and received a hearing before Administrative Law Judge Gregory M. Wilson ("ALJ") on April 12, 2011. (R. 33). In his decision, dated June 27, 2011, the ALJ determined that Plaintiff had not been under a disability as defined by the Act from April 25, 2009 through the date of his decision. (R. 30). Plaintiff requested a review of the ALJ's decision. (R. 8-9). That review was

denied on June 8, 2012; consequently, the ALJ's decision became the final decision of the Commissioner. (R. 4). Plaintiff has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. Section 405(g). For the reasons stated below, this court affirms the decision of the Commissioner.

At the time of her hearing, Plaintiff was fifty-four years old, had completed the tenth grade, and had acquired a GED. (R. 53). Plaintiff previously worked in the human resources department entering data and communicating with potential employees and as a sales clerk. (R. 55-56, 141-42). Plaintiff alleges disability due to her physical pain, memory loss, and concentration problems following a motorcycle accident on April 25, 2009. Prior to the accident, Plaintiff complained of depression, attention and concentration problems, and back, neck, and shoulder pain and was diagnosed with fibromyalgia, spondylosis, and degenerative disc disease. (R. 191-95, 219-20, 313-17, 327-29, 330, 342, 344, 526, 541-44, 615-16, 664, 668-69, 819-20). Plaintiff treated her symptoms with medication, epidural steroid injections, and several surgeries including a knee arthroscopy. (R. 191-194, 340, 541-43, 697).

On April 25, 2009, Plaintiff lost control of her motorcycle and crashed into a ditch. (R. 267). She briefly lost consciousness at the scene of the accident and was transported to Erlanger Medical Center in Chattanooga, Tennessee, for treatment. *Id*. Dr. Paul E. Hoffmann, a head injury and rehabilitation specialist, evaluated Plaintiff and discovered a subarachnoid hemorrhage and a possible C-spine fracture. *Id*. Dr. Hoffmann noted that Plaintiff suffered from a headache, shortness of breath, and nausea. *Id*. Dr. Pradeep Jacob, a neurologist, evaluated a computed tomography ("CT") scan of Plaintiff's brain and determined that she had a "scattered subarachnoid hemorrhage in the right parietal, left frontal, and left parietal lobes[, . . .] a small amount of extra-axial fluid along the left frontal lobe and a milder degree the right [sic] which

may be from volume loss or developing hygroma. . . . [, and a] focus of hemorrhage is seen in the interpenduncular cistern. " (R. 297). Dr. Hoffmann indicated that Plaintiff did not remember the accident, but remembered some of her transportation to the hospital. (R. 267-68). Dr. Phil Megison, a neurosurgeon, determined that Plaintiff did not have a spinal fracture (R. 270). On April 28, 2009, attending physician Dr. Donald E. Barker noted that Plaintiff had fractures on her right seven and eight ribs and was still a little confused. (R. 271). Dr. Barker indicated that a speech pathologist had evaluated Plaintiff and concluded that Plaintiff "was alert, but responded slow, demonstrated difficulty with parameters of memory organization, problem solving and [. . .] would need outpatient ST in discharge closer to her home." *Id*. Dr. Barker discharged Plaintiff from the hospital later that day. (R. 271-72).

Plaintiff alleges that her April 25, 2009 motorcycle accident caused memory loss, worsened her attention and concentration problems, and increased her physical pain. (Pl.'s Br. 2).

## A.    Physical Limitations

After the accident, Plaintiff continued to complain of back, neck, and shoulder pain, which she treated with physical therapy, caudal catheter decompressions, and epidural steroid injections. (R. 324, 330, 344, 526, 664, 668-69). Dr. William E. Gunn, a family medicine practitioner, began treating Plaintiff on June 5, 2007. (R. 690). Throughout his treatment notes, Dr. Gunn indicated that Plaintiff was taking numerous medications; however, on June 3, 2009, Dr. Gunn reported that Plaintiff was not taking pain medications and her pain was controlled. (R. 662-671).

Dr. Vandana M. Maladkar, a specialist in physical medicine and rehabilitation, evaluated Plaintiff on June 17, 2009 and reported that Plaintiff rated her pain as an 8.5 on a scale of zero to ten, and that her pain worsened with any kind of movement. (R. 309). Dr. Maladkar indicated

that Plaintiff did not receive any significant relief from an epidural steroid injection but did receive relief from lateral rotation, moist heat, and soft pillows. *Id*. Dr. Maladkar concluded that Plaintiff's range of motion was decreased, especially Plaintiff's lateral rotation and bending; Spurling's maneuver elicited some discomfort at the cervicothoracic junction; mild tenderness existed over the SI joint; lumbar spine range of motion was limited in all planes with some pain at the end range of flexion and extension; and that the hamstrings were normal in tone. (R. 310).

On August 10, 2009, Dr. Gunn performed a disability examination on Plaintiff and indicated that Plaintiff had memory loss and an unspecified concussion. (R. 670). Dr. Gunn did not prescribe any new medications or treatment plans. *Id*.

On February 18, 2010, Dr. Gunn treated Plaintiff for nasal congestion and shortness of breath. (R. 662). Dr. Gunn stated that he was unsure why Plaintiff was short of breath and recommended that she get a second opinion. *Id*. Dr. Gunn saw Plaintiff again on February 23, 2010 to fill out medical paperwork for an insurance policy. (R. 654). Dr. Gunn reported that Plaintiff had Dystharthria, difficulties concentrating and focusing, and short term memory problems. (R. 657). Dr. Gunn noted that Plaintiff could sit for four hours, stand for one hour, and walk for one hour; should never climb or operate a motor vehicle; could twist, bend, stoop, and reach above the shoulder level; and could occasionally lift up to ten pounds but should never lift more than ten pounds. (R. 659). Dr. Gunn concluded that Plaintiff could work zero hours per day because of her memory loss and stated that he was "unsure if we will see improvement." *Id*. Dr. Gunn recommended that Plaintiff attend physical therapy, speech therapy, and psychological counseling. *Id*.

On April 16, 2010, Dr. Roddie R. Gantt treated Plaintiff for back pain. (R. 493). Dr. Gantt noted that Plaintiff had a normal range of motion and gait and that her muscle mass was

symmetrical. (R. 496). Dr. Gantt diagnosed Plaintiff with degenerative disc disease and lumbar radiculitis. (R. 502). She was treated with a lumbar epidural steroid injection at L3-4 with epidurography. *Id*.

On January 5, 2011, Dr. Robert L. Hash, II, a neurologist, treated Plaintiff for neck, right arm, low back, and right leg pain. (R. 611). Dr. Hash indicated that Plaintiff walked normally and had normal tone in her arms and legs. (R. 612). He found Plaintiff had a limited lateral range of motion in her neck and limited lumbar flexion noting that X-rays revealed scattered degenerative changes in the cervical spine, a central disc protrusion or bone spur at C5-6, and foraminal compression on the left at C5-6. *Id*. Dr. Hash diagnosed Plaintiff with cervical radiculopathy, cervical disc degenerative disease, lumbosacral radiculopathy and lumbar/lumbosacral disc degenerative disease. *Id*. Dr. Hash told Plaintiff that there was a ninety percent chance of improvement in Plaintiff's left arm pain if she would undergo an Anterior Cervical Discectomy and Fusion ("ACDF") at C5-6; however, even with the ACDF, Plaintiff would always have some degree of neck pain and if nerve root compression was not the cause of her pain, the ACDF would not help. (R. 613). Dr. Hash reported that Plaintiff wanted to continue treatment with epidural steroid injections. *Id*.

On March 21, 2011, Dr. Gunn evaluated Plaintiff for a review of systems. (R. 822). Dr. Gunn stated that Plaintiff denied depression, anxiety, suicidal ideations, neck pain, back pain myalgias, arthralgias, knee pain, and joint swelling. *Id*. Dr. Gunn indicated that Plaintiff had a normal range of motion and strength. (R. 823).

On April 6, 2011, Dr. Gantt treated Plaintiff for low back, hip, and neck pain. (R. 945). Dr. Gantt noted that Plaintiff had been doing better since receiving epidural steroid injections

and had not been taking Lortab because her pain was better and because it made her nauseous and itchy. (R. 949).

On December 15, 2011, Dr. Gantt treated Plaintiff for bilateral neck and shoulder pain. (R. 880). Carla Sims, a Certified Registered Nurse Practitioner, noted that Plaintiff did better and took less pain medications after epidural steroid injections. (R. 883). Dr. Gantt instructed Plaintiff to continue taking medications as prescribed, have another lumbar epidural steroid injection in January 2012, and to exercise. (R. 890).

**B.    Mental Limitations**

Dr. Debra Williams, a psychiatrist, diagnosed Plaintiff with depressed mood and attention and concentration problems in 2006, and continued to treat Plaintiff until July 2010. (R. 363-437, 599-607). From 2006 to 2010 Dr. Williams prescribed Adderall, Xanax, and Cymbalta to treat Plaintiff's depression and Attention Deficit Disorder ("ADD"). *Id.*

Dr. Richard P. Hull, a neurologist, was the first to evaluate Plaintiff after her accident on May 28, 2009. (R. 359-61). Dr. Hull determined that it was unclear whether Plaintiff's Traumatic Brain Injury ("TBI") was sufficient to exacerbate or worsen her ADD. *Id.* Dr. Hull indicated that Plaintiff had stopped taking Adderall after her accident and opined that Plaintiff's memory and concentration problems might be resolved if she would resume taking that medication. *Id.*

Dr. Hull reevaluated Plaintiff on June 4, 2009 and determined that her neurocognitive index indicated a subpar level of functioning; memory domain was average because she tested in the thirty-seventh percentile; psychomotor speed was low average because she tested in the eighteenth percentile; reaction time was slow because she scored in the fifth percentile; complex attention was low average because she scored in the thirteenth percentile; cognitive flexibility was low because she scored in the eighth percentile; processing speed was average because she

tested in the forty-seventh percentile; and executive functioning was low because she scored in the seventh percentile. (R. 350-51). Dr. Hull noted that Plaintiff's "overall performance reveals preservation of memory but impaired mental speed and reaction which tend to implicate significant depression with psychomotor retardation." (R. 351). Dr. Hull concluded that Plaintiff likely suffered from ADD and TBI. *Id.*

Dr. Williams resumed treating Plaintiff on June 16, 2009 and noted that she was taking Adderall, Xanax, and Cymbalta. (R. 378). Dr. Williams indicated that Plaintiff's attention and concentration problems and depression were mild, her attention span was short to normal, and her memory was fair to good. (R. 379-80). Dr. Williams concluded that Plaintiff's symptoms were a two to three on a scale of zero to ten with zero being no symptoms and ten being extreme symptoms and that her overall functioning was a six on a scale of zero to ten with zero being poor functioning and ten being excellent functioning. (R. 379). Dr. Williams continued to treat Plaintiff throughout 2009 and 2010 and continued to indicate that her symptoms ranged between a two and a three on a scale of zero to ten and that she continued to function at a level six. (R. 363-437, 599-607). On July 29, 2010, Dr. Williams stated that Plaintiff's symptoms had decreased to a one on a scale of zero to ten and her overall functioning had increased to a seven on a scale of zero to ten. (R. 600). Dr. Williams concluded that Plaintiff had a normal attention span and fair memory. (R. 601).

On January 28, 2011, Dr. Andrea Julia Viegas, a psychologist, evaluated Plaintiff with several tests including the Wechsler Adult Intelligence Scale-III ("WAIS-III") and its subtests. (R. 740-42). Based on these tests, Dr. Viegas concluded that Plaintiff had "an overall mild deterioration in intellectual abilities with low verbal abilities, slowness in speed of information processing, and working memory [. . . and] [m]ild-moderately [sic] impairment is observed in

attention and concentration." (R. 746). Dr. Viegas stated that the severity of Plaintiff's depression further impacted her cognitive functioning. (R. 747). Dr. Viegas concluded that Plaintiff "lacks the residual functional capacity to return to, or attend to, any work tasks on a sustained basis and is incapable of substantial gainful activity." *Id*. Dr. Viegas recommended that Plaintiff continue medication and therapy; begin mild daily exercise and physical therapy; and retest in 16-18 months. *Id*. Dr. Viegas diagnosed Plaintiff with cognitive disorder due to mild traumatic brain injury, severe major depressive disorder, and dysthymic disorder, and determined that Plaintiff's Global Assessment of Functioning ("GAF") score was 70. (R. 748). Dr. Viegas completed the exact same analysis with the same results on February 9, 2011, but concluded that Plaintiff's GAF score was 50 "to reflect inability of [Plaintiff] to return to work due to major depressive symptoms and suicidal watch." (R. 758).

On March 16, 2011, Dr. Viegas completed a Medical Source Opinion (Mental) indicating that Plaintiff had mild difficulties in her ability to understand, remember, and carry out simple one or two-step instructions and "respond appropriately to co-workers or peers without distracting them or exhibiting behavioral extremes." (R. 760). Dr. Viegas further indicated that Plaintiff had moderate difficulties in her ability to respond appropriately to supervisors, customers, and the general public; to use judgment in simple, detailed, or complex work-related decisions; to deal with changes in a routine work setting; and to maintain social functioning and activities of daily living. (R. 761). Additionally, Plaintiff had marked difficulties in her ability to respond to customary work pressures and to maintain attention, concentration, or pace for periods of at least two hours; had extreme difficulties in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to perform

8

activities within a schedule; to maintain regular attendance; and to be punctual within customary tolerances. (R. 761-63).

## II.     ALJ Decision

Disability under the Act is determined using a five-step test. 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If a claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past

9

relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. §
404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant
is able to perform any other work commensurate with her RFC, age, education, and work
experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the
ALJ to prove the existence, in significant numbers, of jobs in the national economy that the
claimant can do given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g),
404.1560(c).

       In this case, the ALJ determined that Plaintiff met the insured status requirements of the
Act through December 31, 2013 and that Plaintiff had not engaged in substantial gainful
employment since April 25, 2009. (R. 15). The ALJ also determined that Plaintiff suffers from
severe impairments including: bilateral shoulder impairment, neck impairment, back impairment,
fibromyalgia, traumatic brain injury, chronic obstructive pulmonary disease ("COPD"),
depression, and bilateral knee impairments. *Id*. However, the ALJ stated that these impairments,
singularly or in combination, do not meet or medically equal a listing because there is no
evidence of sensory, motor, or reflex loss. (R. 15-18). The ALJ further determined that Plaintiff's
mental impairments did not meet or medically equal a listing because they did not create a
marked restriction of activities of daily living; marked difficulties in maintaining social
functioning, concentration, persistence, or pace; or repeated episodes of extended
decompensation. (R. 16). The ALJ based his determinations on Plaintiff's testimony that she can
do light housework, care for her elderly mother, drive, travel, go to church, socialize with
friends, use a computer, care for her young grandchildren, and shop. The ALJ also considered
the numerous post-accident psychological evaluations reporting that Plaintiff's memory is fair to
good and her attention span is normal. (R. 16-18).

The ALJ concluded that Plaintiff has the RFC to perform less than the full range of light work. (R. 19). The ALJ stated that Plaintiff can lift and carry up to ten pounds frequently and twenty pounds occasionally; sit, stand, and walk for up to six hours each in an eight hour workday with normal breaks; however, is limited in that she can push and pull with the lower extremities, never climb ropes, ladders, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can frequently reach overhead with the right upper extremity and occasionally reach overhead with the left upper extremity; must avoid fumes; is limited to low-stress work, defined as simple one to two-step tasks; and must have only occasional contact with the public. *Id*. The ALJ determined that with these limitations, Plaintiff is unable to perform her past work, but that she can perform jobs that exist in significant numbers in the national economy. (R. 29). Thus, the ALJ determined that Plaintiff has not been under a disability as defined in the Social Security Act since April 25, 2009. (R. 30).

The ALJ discredited Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her symptoms to the extent that it contradicted his RFC assessment. (R. 20). The ALJ explained that Plaintiff reported improved symptoms after steroid injections, refused surgery, and was able to drive. (R. 20-23). He also explained that he limited Plaintiff to short, simple tasks because the record indicated that she had a mild degree of short-term memory loss and a mild deterioration in cognitive functioning. (R. 23-24). Ultimately, the ALJ decided that the weight of the evidence indicated that Plaintiff's memory, attention, and concentration problems were not as severe as alleged. (R. 25-26).

## III.   Plaintiff's Argument for Reversal

Plaintiff argues that the ALJ's decision should be reversed on two grounds. First, Plaintiff contends that the ALJ did not properly assign weight to the testimony of Drs. Gunn and Viegas.

(Pl.'s Br. 12-33). Second, Plaintiff argues that the ALJ did not properly apply the Eleventh Circuit's pain standard when he discredited her subjective pain testimony. (*Id*. at 12, 33-41).

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

V.     **Discussion**

A.     **The ALJ Had Good Cause to Dismiss the Treating Physician's Opinion That Plaintiff Could Not Work Due to Memory Loss.**

Plaintiff argues that the ALJ did not have good cause to reject Dr. Gunn's conclusion that she could not work. Of course, this court's limited review precludes it from reweighing the evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). When an ALJ articulates specific reasons for giving the opinion of a treating physician less than controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. *Id*. Moreover, an ALJ is not required to give substantial or considerable weight to a treating physician's diagnosis when good cause exists to disregard the treating physician's evaluation. *Crawford v. Comm'r Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004). The Eleventh Circuit has determined that "'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). An ALJ may also dismiss a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford*, 363 F.3d at 1159; *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).

Here, the ALJ explained that he did not give Dr. Gunn's testimony controlling weight because: Dr. Gunn reported inconsistent conclusions; the remainder of the record supported alternative findings; and Plaintiff's testimony about her abilities contradicted Dr. Gunn's determinations. The ALJ's decision not to give Dr. Gunn's testimony controlling weight was supported by all three of the good cause elements. And because all three elements are met, it follows that the ALJ had good cause for rejecting Dr. Gunn's conclusions.

13

First, the evidence did not bolster Dr. Gunn's opinion that Plaintiff's memory loss prevented her from working. In 2009, multiple psychological evaluations from Plaintiff's treating psychiatrist, Dr. Williams, indicated that Plaintiff had mild to moderate attention/concentration and a fair to good memory. Dr. Williams also repeatedly stated that Plaintiff's symptoms were a two to three on a scale of zero to ten and concluded that Plaintiff functioned at a six on a scale of zero to ten. Dr. Hull also evaluated Plaintiff in 2009 and reported that Plaintiff's headaches and attention were better once she resumed Adderall. Furthermore, Dr. Williams's evaluations indicated improvement throughout 2010. In fact, during 2010, Dr. Williams reported that Plaintiff's symptoms ranged from a one to two on a scale of zero to ten, and that Plaintiff had fair to good memory, and a short to normal attention span. By the end of 2010, Dr. Williams concluded that Plaintiff functioned at a six to seven on a scale of zero to ten.

Second, the evidence supported the ALJ's contrary finding that Plaintiff could work. Prior to February 23, 2010, Dr. Gunn evaluated Plaintiff numerous times and only once indicated that Plaintiff could not work because of chronic knee pain. However, Dr. Gunn later reported that Plaintiff's knee pain improved with physical therapy and encouraged Plaintiff to continue physical therapy and exercise. Moreover, Dr. Hull determined that Plaintiff's "overall performance reveals preservation of memory but impaired mental speed and reaction which tend to implicate significant depression with psychomotor retardation." (R. 351). Dr. Hull's analysis indicates that Plaintiff's problems stemmed less from memory loss and more from impaired mental speed. The ALJ accounted for this when he incorporated Plaintiff's mental and physical limitations into his RFC determination. The ALJ concluded that Plaintiff could only do low-stress, one to two-step tasks and that she could only have occasional contact with the public. (R.

14

19). The ALJ determined that even with those limitations, jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. 29).

Third, Dr. Gunn's opinion was inconsistent with his own testimony. Despite Dr. Gunn's numerous evaluations of Plaintiff, Dr. Gunn rarely mentioned Plaintiff's mental limitations. Prior to February 23, 2010, Dr. Gunn mentioned that Plaintiff had some memory problems but never indicated that her memory loss prevented her from working. In fact, Dr. Gunn only indicated that Plaintiff was precluded from work in September 2009 when he stated that Plaintiff could not return to work because of her accident and chronic knee pain. In November 2009, Dr. Gunn indicated that Plaintiff's knee was feeling better after physical therapy. In later treatment notes, Dr. Gunn advised Plaintiff to continue physical therapy and to exercise. Moreover, on February 18, 2009, one week before concluding Plaintiff could not work, Dr. Gunn evaluated Plaintiff and did not mention any limitations as to her abilities. Because Dr. Gunn repeatedly treated Plaintiff throughout her period of alleged disability and only indicated that Plaintiff's memory loss would preclude her from working on February 23, 2010, the ALJ had good cause to determine that Dr. Gunn's February 23, 2010 evaluation was inconsistent with his other evaluations and, therefore, should be given less than controlling weight.

Plaintiff also argues that the ALJ improperly discredited Dr. Viegas's conclusion that she could not "return to work due to major depressive symptoms and suicidal watch." (R. 758). However, an ALJ can dismiss any medical opinion if the evidence supports a contrary finding. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). The ALJ can also dismiss a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford*, 363 F.3d at 1159; *Edwards*, 937 F.2d at 583. Here, the ALJ gave less

weight to Dr. Viegas's testimony because the ALJ determined that Dr. Viegas's conclusions contained inconsistencies and conflicted with the weight of the record.

The ALJ explained that Dr. Viegas arrived at two significantly different GAF scores based on the same test results. When Dr. Viegas initially ran the tests and evaluated Plaintiff, she concluded that Plaintiff had a GAF score of 70. However, the second time Dr. Viegas evaluated Plaintiff he reported the same test results but concluded that Plaintiff's GAF score was only 50. The ALJ also noted that a GAF score of 70 contradicted Dr. Viegas's conclusion that Plaintiff was unable to participate in substantial gainful activity.

Additionally, the ALJ recounted the inconsistencies between Dr. Viegas's conclusions and Dr. Williams's conclusions. For example, Dr. Viegas reported that Plaintiff had "major depressive symptoms," whereas Dr. Williams repeatedly stated that Plaintiff's depression was mild and her symptoms ranged between a one and three on a scale of zero to ten. Dr. Williams also repeatedly concluded that Plaintiff functioned at a level of six to seven on a scale of zero to ten, which contradicts Dr. Viegas's conclusion that Plaintiff could not participate in substantial gainful activity.

Because the ALJ pointed to inconsistencies within Dr. Viegas's own conclusions and evidence in the record that directly contradicted Dr. Viegas's testimony, the ALJ based his decision to disregard Dr. Viegas's conclusions on substantial evidence.

**B.    The ALJ Properly Applied the Eleventh Circuit's Pain Standard When He Rejected Plaintiff's Subjective Pain Testimony.**

Plaintiff argues that the ALJ improperly applied the Eleventh Circuit's pain standard when he rejected her testimony based on her refusal to get surgery, ability to drive, and continuing pain treatment with injections and decompressions.

The Eleventh Circuit has determined that a three-part "pain standard" applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Id*. When applying the pain standard, the ALJ is not required to recite the pain standard verbatim but must make findings that indicate the standard was applied. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir 1991); *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).

If an ALJ does not give credit to a claimant's subjective pain testimony, the ALJ must discredit the claimant's testimony explicitly and give explicit and adequate reasons for doing so. *Brown*, 921 F.2d at 1236. For example, the Eleventh Circuit has determined that good cause existed for rejecting a treating physician's opinion that a claimant was disabled because of a foot injury when the record contained conflicting medical testimony that the foot injury did not prevent the claimant from performing a sedentary job. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991). When discrediting a claimant's testimony, an ALJ also can take into consideration the claimant's daily activities. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984); *see also Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1984) (finding that substantial evidence to support the ALJ's finding that claimant's complaints of pain were not credible because the record included evidence that the claimant had lifted rocks and had worked washing mobile homes during the period of alleged disability).

Here, the ALJ applied the pain standard using a two-step process and determined that Plaintiff had ongoing physical limitations that were not as severe as alleged. In making this determination, the ALJ first pointed to Plaintiff's daily activities. The ALJ concluded that Plaintiff's problems sitting, standing, walking, and using her knees were not as severe as alleged because Plaintiff testified that she went to church, traveled, drove, and was able to do household chores. The ALJ also pointed to several doctor's reports indicating that Plaintiff walked normally and had a normal gait. Second, the ALJ stated that he found Plaintiff's subjective pain testimony was not credible because Plaintiff continued to treat her pain with injections and decompressions rather than surgery. As the ALJ noted, and as the record reflects, Plaintiff reported significant relief after epidural steroid injections on both April 6, 2011 and December 15, 2011. (R. 945-49, 880-890). Third, the ALJ noted that Plaintiff testified that she drove, which the ALJ concluded indicated that Plaintiff's range of motion was less limited than alleged because driving involves a great deal of neck turning.

The ALJ determined that Plaintiff had some physical limitations in her upper extremities, which he accounted for by imposing additional limitations in his RFC analysis. The ALJ determined that because of Plaintiff's neck, shoulder, arm, and back pain, she could only lift and carry ten pounds frequently and twenty pounds occasionally, could push and pull with her legs, could not climb, and could only occasionally reach overhead with her left arm. (R. 30).

The ALJ based his determination that Plaintiff's subjective pain was not as severe as alleged in her daily activities, treatment decisions, and mitigating medical records, and explicitly stated adequate reasons for discrediting Plaintiff's subjective pain testimony, the ALJ properly applied the Eleventh Circuit's pain standard.

**VI.      Conclusion**

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and that the ALJ properly applied the legal standards in reaching this determination. The Commissioner's final decision is therefore due to be affirmed and a separate order in accordance with this memorandum will be entered.

**DONE** and **ORDERED** on August 7, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE